## Devling *against* Williamson.

If evidence be inadvertently given to the jury without objection, which, during the progress of the trial, is discovered to be illegal, it is the duty of the court to reject it; or the party may require the court in their charge to instruct the jury to disregard it.

A witness in his deposition, after detailing the circumstances of an interview between the parties, added, "the contract with T. W. was considered at an end by all parties:" *Held*, to be admissible as his assertion of his knowledge of the fact, that all the parties agreed that the contract was at an end.

An office paper taken out of the files by one who has no official connection with it, and produced in court, cannot be given in evidence; it must be produced and authenticated by the proper officer in whose custody it was.

*Semble*, that public officers allowing papers or records to be taken from their offices without the process or order of a court, are responsible with their sureties for the loss or mutilation of such documents.

In an action of ejectment founded upon a legal title, where the defendant rests his defence upon an agreement of purchase, it is not essential to the plaintiff's right to recover that he should have tendered a deed to the defendant before suit brought.

The conflicting cases of Southerland *v.* Purry, 2 *Penn. Rep.* 145, and Brown *v.* Metz, 5 *Watts* 164, as to this point, overruled, and the case of Smith *v.* Webster, 2 *Watts* 478, reviewed and affirmed.

ERROR to the common pleas of *Centre* county.

This was an action of ejectment by Samuel Williamson and others, heirs at law of Thomas Williamson, against John Devling and Daniel Maurer, for 150 acres of land.

The plaintiffs gave evidence, showing the legal title to the land to be in Thomas Williamson, now deceased, and that they were his heirs at law. The defendant, John Devling, did not controvert the original title, but contended that that title should be conveyed to him, and gave in evidence an agreement of the 4th of February 1832, by which Thomas Williamson agreed to sell the land to him for 1650 dollars, one-half in hand, and the residue in annual payments of 150 dollars until 1838, when the last payment of 225

[Devling v. Williamson.]

dollars was to be made. By the terms of the agreement Williamson was to give a good and sufficient title in law and equity for the land at the payment of the hand money. Previously to this, on the 10th of January 1829, Williamson, by an agreement with Curts, Hepburn & Co., had granted to them the exclusive right to dig ore on the land for the consideration of twenty-five cents a load. Devling was aware of this, and on the 5th of February 1832 he took an assignment of the agreement of Curts, Hepburn & Co., which was delivered to him. During the progress of the trial the plaintiffs offered in evidence a deposition of David Marten, to the reading of which several objections were made and overruled by the court, who sealed a bill of exceptions.

After the deposition was read as far as admitted by the court, concluding with, "When James Williamson paid to said John Devling the one hundred dollars, the contract with Thomas Williamson, deceased, was considered at an end by all the parties." The defendant objected to this part of the deposition and asked the court to reject them or give him a bill of exceptions, which the court refused to do, stating that there was no special exception to these words of the deposition: That the bill was signed and the deposition read and refused to interfere at this time further, and the defendant excepted to this opinion of the court.

The plaintiff then offered in evidence the original administration account of James Williamson and David Marten, administrators of Thomas Williamson, and to read Item, No. 10, a credit for 100 dollars paid to John Devling. The defendant objected to the paper on the ground that it was not a certified copy. The plaintiffs then called Samuel Hepburn, Esquire, as a witness; the defendant objected to Mr Hepburn giving any evidence on the subject of the paper, as he is not the officer of the orphans' court of Cumberland county, from which the paper was brought. The court overruled the objection, and the witness testified as follows: "I got this account from the clerk of the orphans' court of Cumberland county. It is the only paper on file in that office touching that estate. I am an attorney of that court. I am not the clerk or the deputy of the orphans' court. I got the paper out of the file." The court admitted the paper and sealed a bill of exceptions at the instance of the defendant.

All the other exceptions and questions of law determined in the case arose out of the facts and opinion of the court upon them. After stating the facts in relation to the agreement to purchase the land and the assignment of the agreement with Curtz, Hepburn & Co., on the 5th of February 1832, the court thus instructed the jury:

" On this same 5th of February 1832, Devling, on his way home, thus writes to Williamson:

" 'After I left your house I began to think more about the agreement you made with Samuel Hepburn, and I called to see lawyer Valentine, of Centre county, and showed him the agreement you made with Hepburn. He told me that it gave Hepburn privilege

[Devling v. Williamson.]

at any time to dig for ore, and it prevents you or me from disposing ore at any time off that farm; and further, that, if you did not give him the refusal of the land, as you had agreed in writing, that you lay open to him for a suit of damages. He told me not to let Hepburn and Curts' know that I had the agreement—that your best plan would be to get a release from Hepburn. You also have given him the privilege of a road. I cannot go on to have it surveyed or any thing until it is settled, as I could not think of owning land that another man could dig on when he pleases, or that, if there was ore in it, that I must give it to any person against my will.' He requested an answer. You will observe that Devling had purchased with the incumbrance; he had taken an assignment of Curts, Hepburn & Co.'s article, and thereby placed himself in Devling's shoes. He wanted Williamson to get a release from Hepburn, but this was his own business. He could not think of owning land that another man could dig ore on when he pleases, or that, if there was ore on it, he must give it to any person against his will. We believe this to be a refusal on the part of Devling to perform his contract;—you will judge.

"It would seem that old Mr Williamson was somewhat alarmed at omitting to give Curts, Hepburn & Co. the refusal of this property. The hand money was to be paid and the title made on the 1st of May 1832. About the middle of May 1832, as proved by Wilson and others, Mr Devling called on old Mr Williamson; according to the evidence of C. Wilson, Devling stated he came to fulfil his contract respecting the land. He said he had brought a blank deed—Williamson said it was right. Williamson said Samuel Hepburn had been there or written to him respecting the land and he was afraid he was going to get into trouble. The parties agreed that the land should be offered to Curts, Hepburn & Co. at 15 dollars an acre, and if they took it Devling was to get the advance of 4 dollars an acre. At this time, the 14th of May, Williamson wrote to Curts, Hepburn & Co., 'that he had an opportunity of selling the land which he had agreed to give them the refusal of. His price was 15 dollars per acre: if they wished to purchase at that price he requested notice before the 15th of June then next. If they refused to accept this he would not consider himself longer bound.' Wilson called on Curts when he returned home, and he said he would take the land at 15 dollars per acre, and on the 13th of June 1832, John Curts, for Curts, Hepburn & Co., writes to Wilson that they had concluded to take the land, and that Mr Hepburn had gone to make the necessary arrangements.

" Prior to this, on the 25th of May 1832, Mr Williamson wrote to Devling that Hepburn had called on him as he went to Baltimore, asked the price of the land, and that he told him 15 dollars per acre. The hand money 1000 dollars, the rest in three yearly payments, and that he said he would write to Curtz and let him know as he returned back.

IX.—2 B*

[Devling v. Williamson.]

" On the 16th of June 1832, John Devling writes to Williamson a letter informing him that Wilson served the notice before Hepburn had come home; that Curts did not care for the land if he got an agreement respecting the ore which Devling refused.

On the 13th of July 1832, Williamson writes to Devling, acknowledging the receipt of the letter of the 16th June, and that he had received a letter from Wilson, that Curts & Co. would take the land, and that he had requested them to come down in August or beginning of September.

" On the 8th of September 1832, Williamson writes to Devling, that he had written to Hepburn to come on the last of August, or the first of September, and they had not complied; that he had wrote to Wilson a few lines to read to them, and to give them to the 20th of the above stated month. He died, shortly after 22d September intestate; administration on his estate was granted to his son James and his son-in-law David Marten. Matters rested until June 1833, when Wilson and Devling both appeared at James Williamson's, when the agreement of the 10th June was obtained. The court referred to the testimony of James Williamson, David Martin and Charles Wilson; as to this agreement you have heard the evidence; if a fraud was practised upon Williamson and Marten, as they swear, then that agreement is utterly void and of no effect; and if the receipt of the 100 dollars paid on the 5th of February 1832 was surrendered as they swear, then the contract was abandoned, and the defendant has neither claim nor pretence of claim to the land. If, on the other hand, the jury should find it was surrendered for the purpose stated by Wilson, it will present other considerations.

" The administrators as administrators, had no claim over the land, except in such cases as the legislature have vested special powers. Amongst other powers given by the legislative enactments, is the power of perfecting and consummating contracts, in part executed; especially written contracts. If this contract was resigned or abandoned by the defendant, he is not entitled to have a specific execution; nor is he entitled to have a specific performance, and unless the articles were fairly obtained, and without surprise and circumvention.

" Equity will relieve against a clear mistake, as well as against fraud. If the defendant waived his original contract; if he trifled with it or refused to perform it, or if his acts are inconsistent with a due execution of the contract, a jury ought not to give him a specific execution. Did he not refuse by his letter of the 5th of February 1832? If you so find, and new agreements were made, he is not now entitled to a specific execution of the old agreement. He must resort to his remedy on the new agreement.

" Defendant's counsel ask us to instruct you, that the original article of agreement, being executed on the 4th of February 1832, constituted the contract between the parties, and of itself bound them

[Devling v. Williamson.]

respectively to comply with its provisions; that the assignment of the article of Samuel Hepburn for Curts, Hepburn & Co., with Thomas Williamson, dated in 1829, on the 5th of February 1832, did not change nor alter the contract of the 4th of February 1832.

" We agree, it did not alter or change the contract of the 4th, but we consider it auxiliary to it. The 100 dollars was paid on the 5th; the assignment on that day, we think, is to be taken together—one entire contract—and on the evidence should be so considered by the jury. We agree the parties are bound respectively to comply with their agreement of the 24th and of the 5th February 1832.

" 2. That the letter of the 5th February 1832, Devling to Williamson, is not of itself in law a rescission of the contract.

" The letter is not in law a rescission, but it is a refusal by Devling to fulfil his agreement, unless on conditions, which were in the judgment of the court inconsistent with the assignment on the 5th, and with the entire contract between the parties.

" It is the opinion of the court, that John Devling should have gone forward and paid his money, and took a deed for the land, and have carried into effect the agreement with Curts, Hepburn & Co. If he refused to fulfil that agreement after he took the assignment of the agreement of Curts, Hepburn & Co. it was a refusal on his part to perform his engagements. Devling's whole money is due. He has not brought a cent into court; he has not offered to secure a cent; what equity has he against these heirs? He has cleared a few acres on the land, and has received the benefits from the clearing. If he had brought his money into court, and the jury should have found for the defendant, the court would not have permitted the plaintiff to have taken that money out until a conveyance was made, under their direction, to Mr. Devling.

" We think, at all events, the verdict should be for the plaintiffs. And if the jury think, under the principles we have stated, that a specific execution of the contract should be decreed, and the bargain was not rescinded, to be released on the payment of the purchase-money, you will find the amount and fix a reasonable time for payment. It is a general principle of the law, that the possession of land is equal to the interest; where money is tendered and retained, and brought into court until a deed is made, it will take the case out of that principle; so if the plaintiff waived the payment of interest.

" If the verdict should be so found, and the money paid into court, we will not permit the plaintiffs to take it out until a deed is executed."

Errors assigned.

1. On admitting part of the deposition of David Marten, as in the first bill of exceptions.

2. On the admission of the administration account of Thomas Williamson's administrators.

3. The court erred throughout the whole charge, in making the plaintiffs below at one time parties, in forcing the specific performance of contracts entered into between Thomas Williamson, and at other points as parties disaffirming the contract, and treating the defendant as if he was a party plaintiff asking for a specific performance.

4. In instructing the jury " that Devling's letter of the 5th February 1832, was a refusal on the part of Devling to perform his contract—you will judge of it."

5. They erred in the legal construction of the articles of agreement of the 10th June 1833, as to its effect on the rights of the plaintiffs and defendants below.

6. There is error in the answers to the several requests for instruction by the counsel of the plaintiffs in error to the jury.

7. The court erred in instructing the jury, that at all events there should be a verdict for the plaintiffs below.

*M'Allister* and *Blanchard*, for plaintiffs in error.
*Merrill*, for defendant in error.

The opinion of the court was delivered by

ROGERS, J.—The plaintiffs in error except to the deposition of David Marten, in whole and in part. He objects that the witness has a direct interest, that he swears about an article, signed by himself and James Williamson, and he also excepts to that part of the deposition in which the deponent says: " When James Williamson paid the said John Devling the one hundred dollars, the contract with Thomas Williamson was considered at an end by all parties." It is sufficient to observe, that the first two reasons are destitute of any plausibility.   I shall, therefore, confine my remarks to the exception to the part of the deposition which has been noted.   After the deposition was read, the counsel excepted to this part, but the court overruled the exception, stating that there was no special exception to these words until after the bill was signed and the deposition read.   We are not satisfied with the reasons assigned.   It is an undoubted right, of which a party cannot be deprived, that, when he discovers, at any stage of the cause, that improper testimony has been inadvertently received, he may have the error corrected, on application to the court.   When the attention of the court is called to it, it is their duty promptly to reject it, and the sooner the minds of the jury are disabused the better; they ought not to be permitted to be influenced by testimony not properly nor legitimately before them.   The party injured may have it corrected, either at the time it is discovered, or he may request the court to charge the jury to disregard it.   But was this part of the deposition admissible ?   We cannot perceive that it is open to the objection, that it is merely the opinion of the witness; on the contrary, we conceive that it is the assertion of his knowledge of the fact, that

[Devling v. Williamson.]

all the parties agreed that the contract was at an end.    It was "considered" viz. it was understood or agreed, that the contract should be cancelled.    It is very like the case of Cotton *v.* Huidekoper, 2 *Penn. Rep.* 149, and many of the remarks there are applicable here.    Some latitude must be allowed in examining depositions, as many of them otherwise, being taken without the aid of counsel, would be inoperative.    It does not appear from what source the deponent obtained his knowledge, but had the defendant attended at the taking of the deposition, which it was his duty to do, on the cross-examination or in chief, it might have appeared whether the witness arrived at the conclusions, from the express declaration or agreement of the parties, or it might have been shown that this was merely his own impression or understanding of the transaction.

The next is the exception to the administration account.    Mr Hepburn, who, at the time, was at the bar, testifies that he got the account from the clerk of the orphans' court of Cumberland county. He says he got the paper out of the files, and that it is the only paper, on file in that office, relating to the estate of Thomas Williamson.    The administrator's account was admitted to prove item No. 10, touching the payment of one hundred dollars, which was truly supposed, by both parties, to have a material bearing on the issue.    To permit a person, other than the officer to whom is committed the keeping of the records, to take them out of the office is a most dangerous and pernicious practice.    To save expense, and sometimes to avoid delay and trouble, when a paper has been unexpectedly wanted, this reprehensible practice has obtained in this state.    From this it has resulted that many of the records and documents have been lost or mislaid.    But this practice should be corrected.    And even where the trial is had in the county, the record should (if permitted to be brought into court at all, and this should only be allowed under special circumstances) be entrusted only to the sworn officer or to a person specially authorised by him.    The public documents should not be allowed to go into the hands of any person, unless to one answerable for their safe custody.    But here the practice has been carried to a much more unwarrantable extent.    A paper purporting to be a record, but which has no official mark upon it, is brought to a distant county, by a stranger having nothing to do with its custody, and who has no other knowledge of its authenticity except what arises from the fact, that he himself took the paper from the file in the proper county.    Besides the danger that records may be defaced, lost or mislaid, we are exposed to the danger of imposition and fraud.    From the high character of the witness, there can be no imputation of any unfair dealing here; but it must be recollected that we are settling a precedent, which may lead to very great abuses in the hands of the artful and unscrupulous.    There is nothing lost on the score of convenience in excluding such testimony, as the party may have the benefit of the evidence by a certified or sworn copy of the record,

[Devling v. Williamson.]

or when the original document is required by a subpœna *duces tecum* to the proper officer, or by a special order of the court. This proof is sometimes necessary to obtain the production of original papers filed in the surveyor general's office, in the land office, or in the executive department. It would be thought an extreme irregularity to say the least of it, if, on the trial of a cause, public documents belonging to either of these officers should be received as testimony, on the oath of a person not having any official connection with them deposing to the fact that he had taken them off the file; and it would be still more objectionable if it appeared that the papers had no official mark upon them. In all cases, whether the trial be in or out of the county, where the original is required, there should be a subpœna *duces tecum*, or a special order of the court. Nor should an officer, on any pretence whatever, allow a paper to be taken from the office, except in obedience to the process or order of the court. If our public officers were aware of the difficulties to which they or their sureties may be exposed by the mutilation or loss of records, this evil would be promptly corrected. It is very well known that there is hardly a case which involves the investigation of an ancient transaction, but gives rise to embarrassments arising from this cause.

Both parties claim under Thomas Williamson. The plaintiffs as his heirs at law, the defendants by virtue of the contract of the 4th February 1832. This contract is not denied, but it is said that it was cancelled, either in the life time of Thomas Williamson or since his death. Nothing appears in the testimony which satisfies me that the contract was annulled in the life time of Thomas Williamson. The letter of the 5th of February is not a rescission of the contract of the previous day, although it suggests difficulties in *its* completion which put it in the power of Williamson to put an end to the agreement. But instead of pursuing this course, if we are to believe the testimony, both parties considered the contract as subsisting, and entered into subsequent stipulations, by which a sale was to be made, under certain terms and conditions, to Hepburn & Co., in pursuance of a prior agreement. This case will turn, in a great measure, on what occurred after the death of Williamson, and this will mainly depend on the credit to be given to the witnesses: of this the jury are the exclusive judges.

It is insisted that there was error in instructing the jury, " that at all events the verdict should be in favour of the plaintiff." The court would seem to have been of the opinion, that whether the contract was rescinded or not, inasmuch as the purchase-money was unpaid, the plaintiff was entitled to a verdict, to be released on certain conditions; and that, although the deed may not have been tendered before the commencement of the suit. And in this direction they are supported by Smith *v.* Webster, 2 *Watts* 478; although it cannot be disguised, the decision is in opposition to Southerland *v.* Purry, 2 *Penn. Rep.* 145; and Brown *v.* Metz, 5

[Devling v. Williamson.]

*Watts* 164. The case of Smith *v.* Webster puts the point on its true grounds. Where a plaintiff has the legal title it is all that is required to enable him to maintain the action of ejectment. The defendant, who has the equitable title, goes into chancery, who enjoins the plaintiff from proceeding at law, and the defendant becomes the actor. But chancery will in no case enjoin the plaintiff, unless the defendant has done equity, by paying or agreeing to pay the purchase-money. Where, therefore, he has not paid nor offered to pay, nor is willing or ready to perform his agreement, he has no right to a conveyance, and equity will not interfere to protect his possession. A court of chancery always considers the condition of the parties at the time of the decree, rather than their situation at the commencement of the suit. In analogy to this acknowledged power of a court of equity, we have introduced the practice of doing equity by means of a conditional verdict, and in this way the ends of justice are answered, by a verdict in the nature of a special decree. This course possesses this decided advantage, that the whole controversy may be settled in one suit, as it is the duty of the jury, when the defendant defends his possession on the ground of equity, arising from a purchase, to ascertain the amount if any that is due, and to give a verdict for the plaintiffs, to be released on payment of the arrears of the purchase money.

In this state, where a defendant defends on the ground of an outstanding equity, there is no reason that the same principles should not be applied; and as to the costs, it is already decided, in Hart *v.* Porter's Executors, 5 *Serg. & Rawle* 203, since repeatedly recognised, that the jury may, in the verdict, under the direction of the court, do equity.

Judgment reversed, and a *venire de novo* awarded.